## PEOPLE v. HANTTULA.

1. Homicide—Hearsay.

Where defendant, charged with homicide of his neighbor while both were deer hunting, claimed a second neighbor was hunting in the vicinity, it was prejudicial error for prosecution to present hearsay testimony of whereabouts of second neighbor at time in question.

2. Same—Jealousy—Evidence—Failure to Object.

Where prosecutor, near the close of the people's case in prosecution for murder, offered 3 typewritten statements, consisting of questions and answers taken during two weeks of intensive examination of defendant by the sheriff, the prosecutor and a member of the State police, as to matters tending to suggest to jury that defendant was jealous of the deceased, notwithstanding the negative answers given, must have known there was no proof whatever of the jealousy suggested, such erroneous admission of testimony is not included as ground of reversal in the absence of objection by defendant.

3. Same—Murder—Involuntary Manslaughter—New Trial.

Where prosecution for murder resulted in verdict of involuntary manslaughter and errors in trial necessitated reversal, new trial, if any, is limited to charge of involuntary manslaughter.

Appeal from Iron; Bell (Frank A.), J. Submitted January 13, 1949. (Docket No. 69, Calendar No. 43,893.) Decided May 18, 1949.

References for Points in Headnotes

[1] 26 Am. Jur., Homicide, §§ 366, 587.
[2] 3 Am. Jur., Appeal and Error, §§ 343, 344; 26 Am. Jur., Homicide, § 586.

Gust Hanttula was convicted of involuntary manslaughter. Reversed and remanded with instruction to set aside verdict and judgment.

*L. J. Archambeau,* for appellant.

*Stephen J. Roth,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Daniel J. O'Hara* and *Harry W. Jackson,* Assistants Attorney General, and *F. Lloyd Symmonds,* Prosecuting Attorney, for the people.

REID, J. Defendant in the information filed in this cause was charged with the crime of murder. The jury found him guilty of involuntary manslaughter. From the judgment and sentence imposed in pursuance of the verdict, defendant appeals.

The people relied on circumstantial evidence to show defendant's guilt of murder of his neighbor Wayne Maki on November 15, 1946. Defendant lives about 2 miles northwest of Amasa, Michigan; is 38 years of age and has 4 children; has lived in or near Amasa all his life, and on the farm where he now lives about 12 years. The deceased, Wayne Maki, lived about 3/4 of a mile from defendant's farm residence. Defendant and his brother, Reino Hanttula, had hunted deer together with deceased Maki during the forenoon of November 15, 1946, the first day of the deer hunting season, and returned home for lunch at noon. Defendant and his brother after lunch again went out hunting. Defendant claims he saw and talked with 3 hunters from Detroit who went in a direction west from defendant's residence. Defendant claims to have seen a neighbor, Gennara, crossing the field north of his house during the afternoon, but could not tell whether the man he saw had a cane. Gennara usually carried a cane.

From the early afternoon hunting, defendant returned to his house about the time for the school bus to appear. Upon leaving his house for hunting for the third time during the day, defendant got to the road as deceased Maki drove up with his truck, which Maki parked beside the roadway nearly in front of defendant's house. After some discussion, on Maki's suggestion, defendant and Maki agreed to hunt in or near the Hemalainen field, which was a grassy field interspersed with irregular patches of brush and second growth trees, about one-half mile north of defendant's house. Deer hunters apparently appreciated this was an excellent field for hunting, especially at dusk. Defendant and Maki believed that Gennara was hunting at that general locality and it was agreed that if Maki, who was going ahead, should see Gennara, Maki was to raise his hand, as a signal to avoid interfering with Gennara's hunting. Defendant testified Maki said he was going to the further (northerly) end of the field. Defendant testified that he last saw Maki at a turn in the open part of the field, some distance beyond which point Maki was afterwards found dead from a rifleshot.

Defendant testified Maki had said he had a flashlight and would stay a longer time than defendant wanted to stay hunting; that he (defendant) stayed "posted" till nightfall and being without a flashlight and unable to see his gunsights, returned to his house; that when he was about 300 feet from his house he heard a shot as of a 22-caliber rifle; that when he got near his house, he went to Maki's truck and blew the horn for Maki but got no response; that he had supper and 3 times during the evening his wife told him to go and see about Maki, inasmuch as Maki had not returned. Defendant testified that thrice during that evening he went outside of his house, not further than his gate, and looked for

light from Maki's flashlight, but that God seemed to forbid him going further, that he was afraid he would be shot if he went without a flashlight; that he tried to fix up his flashlight but that it was not good enough to track deer or blood in the woods, and that Maki could take care of himself with the aid of his own flashlight.

The next morning defendant was awakened by his family and noticed Maki's truck still in front of defendant's house. He then without waiting for breakfast went up to the field in question to a point where he had last seen Maki and within a distance of (apparently) 25 rods from that point he discovered Maki's dead body.

. Maki had apparently been sitting or standing near or on a rock at the edge of some bushes where he commanded a view across part of an open field. The rifle bullet which cause his death seems to have entered directly from the front, pierced his heart and went clear through his body. Search did not disclose any place where the bullet was finally lodged. A small basswood sapling 18 feet, 6 inches southeast from the stone where the body was found, was freshly grazed by a bullet. If Maki was sitting on the stone when he was shot, the fatal shooter must have stood within 40½ feet of him in order to cause the graze in the sapling and hit Maki's heart. A stone fence was about 106 feet southeast of the stone where the body was found but it seems that the contour of the intervening earth was such that Maki must have been standing on or near the stone, if the shot came from a distance so great as or greater than 106 feet from the stone.

Defendant's testimony was that he was not hunting in a direction southeast of the stone in question.

Certain circumstances and actions of defendant unnecessary to be set forth in detail were relied on

by the prosecution to make a chain of circumstantial evidence.

During the trial, defendant brought out the fact during examination of one of the people's witnesses, that defendant had said that a neighbor Gennara had been in the Hemalainen field on November 15th. During direct examination of people's witness, sheriff King, the following occurred:

"*Q.* When was Gennara's name mentioned to you the first time?

"*A.* That morning.

"*Q.* By whom?

"*A.* By the boy.

"*Mr. Archambeau* [attorney for defendant]: I object to who it was mentioned by, and move it be stricken.

"*Judge Bell:* We will take it.

"*Q.* By what boy?

"*A.* Gust Hanttula's boy [William Hanttula, aged 11 years].

"*Q.* Where?

"*A.* By the Hanttula gate.

"*Q.* The morning you came after you received the call.

"*A.* Yes, sir. The same morning and before I went up to the field.

"*Q.* And what did the boy say to you?

"*Mr. Archambeau:* I object; it has already been in the record;—it is pure hearsay.

"*Judge Bell:* Cross-examination—you opened this question—and counsel may inquire briefly about it.

"*Q.* What did the boy say to you?

"*A.* When I arrived at the Hanttula home the boy came running to the gate and said, 'Wayne Maki is dead there in the field and Gennara shot him.'

"*Q.* And that is why you went to the Gennara home to check their guns?

"*A.* Afterwards; yes.

"*Mr. Archambeau:* I object to the testimony—voluntary—

"*Judge Bell:* I will allow it to stand since you introduced the subject."

The record shows that the circuit judge was in error in stating that defendant's counsel had "opened this question."

The testimony of King as to what the Hanttula boy said was hearsay. The court was in error in admitting that testimony. In view of the factual situation hereinbefore recited, we deem the error prejudicial.

Also during the direct examination of sheriff King the following occurred:

"*A.* After I got Gust Hanttula's gun I went to the Gennara farm to see if he had any guns there; I went to the Gennara farm because his name was mentioned.

"*Mr. Archambeau:* I object to when it was mentioned. That is hearsay.

"*Judge Bell:* Part of the investigation.

"*A.* His name had been previously mentioned as being seen up in the field and I proceeded to his farm to see if they had any guns, and we found a 22 repeater action, Colt action, and a 31 Japanese rifle. Mr. Gennara asked me why I was looking at the guns and I told him, 'Didn't you hear of a man killed in the field'—and he said, 'No, who got killed?'

"*Mr. Archambeau:* I object to any hearsay testimony.

"*A.* I said, 'Wayne Maki.' He said, 'My best friend— one of my best friends.' I asked him, 'Were you up in that field yesterday?' He said, 'No, sir, I never go in that field.'"

The prosecution was already apprised when this testimony was taken of the fact that defendant claimed Gennara was in the Hemalainen field on the day Maki was shot. It was prejudicial error to ad-

mit the hearsay statement that Gennara said that he was not in that field that day. Gennara was not produced as a witness.

Our decision, hereinafter set forth, is that the verdict and judgment must be set aside. If the prosecution shall present the case for a new trial, it will then be necessary that the prosecution avoid matters improperly prejudicial to the defendant.

The prosecutor offered in evidence 3 typewritten statements, consisting of questions and answers, taken during two weeks of intensive examination of defendant by the sheriff, the prosecutor and a member of the State police. Defendant's attorney did not expressly consent to the statements being received in evidence nor did he object thereto. He was put in an unfavorable position by being required to object to the prejudicial questions in the statements or be deemed to have waived the objection. We note in particular the following portions of the statements read to the jury:

"*Q.* Are you of the opinion or were you ever under the impression that Wayne Maki, the dead man, is the father of your youngest child?

"*A.* No, I am not. * * *

"*Q.* Do you believe that one of Wayne Maki's sins were that he committed the sin of adultery with your wife?

"*A.* No. * *. *

"*Q.* Did you suspicion that Wayne Maki and your wife were meeting down in that field last summer?

"*A.* No."

The statements in question were read just before the conclusion of the people's case at a time when it must be considered that the prosecutor knew he had no proof whatever of the jealousy implied in the questions and of course knew the negative character of the answers with the consequent result that he was offering no proof whatever of the jealousy sug-

gested in the questions. The quoted questions and answers served no legitimate purpose in the people's case. It must be inferred that the prosecutor had in mind, in reading the questions quoted and answers thereto, to instill into the minds of the jury without any evidence to support it, the belief that defendant entertained a jealous malice toward deceased, and that such belief on the part of the jury would not be entirely dispelled by the negative answers. This, no public minister of justice has a right to do.

Defense counsel made no objection to the prejudicial matter of these questions and answers. He bases his appeal on other grounds. Hence, we do not include such matters as a reason for reversal but the prosecutor should avoid improper prejudicial matters on a retrial.

In view of our decision, it is not necessary to discuss other matters claimed by defendant to be error.

For the errors recited, the judgment appealed from is reversed. The case is remanded to the trial court with instructions to set aside the verdict and the judgment. The new trial, if any, shall be limited to a charge of involuntary manslaughter.

SHARPE, C. J., and BUSHNELL, BOYLES, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred.